Stanard, J.
The first and preliminary question in this case, is, were there proper parties before the Court when the decree appealed from was rendered ?
The supposed defect of parties results from the death of Sail, one of the executors of Kee, which was suggested in the Circuit Court at the term at which the decree was rendered, and the failure to revive the suit by or against his representative before the decree was rendered.
The suit was instituted by Boggs and Hall, the co-executors of Aaron Kee, against the creditors of their testator, some of whom were prosecuting suits at law against the executors, and others named who were not suing at law, and all other creditors not named, and the widow and infant children of their testator. The main object of the suit was to have the executorial accounts settled under the direction of the Court, and the remaining assets, if any, appropriated to the creditors entitled thereto; and protection from the pursuit at law of the creditors for the payment of whom the assets were inadequate.
In the progress of the suit the executorial accounts were stated on commitments and recommitments to com *122 missioners of the Court, and reported to the Court. Numerous exceptions were taken by the parties; which were adjudicated by the Circuit Court, and in conformity with the decisions of the Circuit Court a reformed report, to which there was no exception, had been made and returned, before the term of the Court at which the death of Hall, the executor, was suggested; and the case was then heard and the decree rendered, without objection from the surviving plaintiff and executor that it was not proper to hear and decide the cause before the representative of his co-executor was made a party ; without a suggestion from him that he required the aid of such representative in the settlement of the executorial accounts; or to share the burthen of the decree that might be rendered; and without any step having in view the revival of the case against such representative.
The suit was brought by the executors jointly. All the accounts of the administration rendered by them, were joint. In the whole course of this tedious and voluminous litigation, the administration is represented as joint, for which both executors were jointly and severally liable to the whole extent, so far as the assets were chargeable by creditors; and during the life of Hall, every litigated question, the decision of which the appeal brings under the revision of this Court, was decided by the Circuit Court. It is in a case so circumstanced that this objection for the want of parties is urged in the appellate Court, as requiring that Court after the case has lingered so long there, to send it back to the Circuit Court without any investigation of, or decision on the merits; and leave the case to the fate to which such a course would inevitably consign it, that of a litigation which may be protracted for an indefinite length of time. Is the objection tenable ?
The objection is urged in behalf of the surviving executor, for the first time, in the appellate Court. If any other benefit could result to him than the mere delay of *123 this protracted litigation, I should think it ought not to avail in the appellate Court, because he on the face of the record, is confessedly bound for the whole of the assets, and his failure to suggest or insinuate the objection to the proceeding of the Court below, without the representative of the co-executor, and to claim that he should be made a party, to aid in protecting him from, and sharing the burthen that the decree might impose, was a waiver of the right, if right he had, to have that representative a party before the decree should be rendered. Furthermore, what advantage could the surviving executor derive from having the representative of the co-executor before the Court ? To have a new account, so as to shew the separate primary responsibilities for the aggregate amount of assets shewn to be in hand by the joint account ? This would have been totally inadmissible. After acting and accounting jointly, for near twenty years, without an effort, or even the intimation of a wish, that the accounts should be framed and stated so as to shew their several responsibilities inter se, the court ought not to have even countenanced such a pretension. To have indulged it at that stage of the litigation, would have violated the plainest principles of justice, by rewarding with success a scheme to add indefinitely to the delays to which the parties had already been exposed. The decree on the merits, involved in the Court below the consideration and decision of 42 exceptions of the plaintiffs, and 41 of the defendants, some of which branch out into specifications amounting in the aggregate to 63. These exceptions and specifications presented upwards of 146 questions of law or fact, or both, for the adjudication of the Court below, all of which might have been propounded for adjudication by this Court, by the appeal that has been taken to it.
The counsel of the appellee insisted that the questions of fact involved in the exceptions to the commis *124 sioner’s report, and adjudicated by the Judge in his decisión on the exceptions, were not examinable in this Court; and on that ground forbore to enter into the investigation of the evidence bearing on them that the rec°rá furnishes. My opinion is, that as the appeal in a chancery case brings up for examination by this Court, every question of law and fact on which the decree is founded, and which has been adjudged by the Court below, errors in the decision of facts involved in exceptions to a commissioner's report, and dependent on testimony examinable by the Court below, may be with as much propriety objected to in this Court, as error in the adjudication of any other fact adjudged by the Court below, and necessary to the vindication or impeachment of its decree. It is not sufficient to say that such investigations impose on this Court a burthen which it cannot bear, and dispose of the mass of business which is brought into it. That is an argument for the Legislature, by which the jurisdiction of this Court is defined ; and the subjects for the action of its judicial functions determined. The law which gives the right of appeal as to law and fact, imposes on the appellate tribunal the duty of investigating and deciding both.
Although all the questions of fact involved in the 146 exceptions and specifications might have been brought up, and propounded for decision by this Court, a very large portion of them have not been so brought up by the appeal in this case. The number requiring investigation by this Court is comparatively few. , They have been so reduced thus:
1st. In respect to many, the Court below forbore to make any decision, and referred them back to the commissioner for further enquiry, and new evidence. To the report on this recommitment, there are no exceptions, and whether the items have been retained in, or rejected from the last report, they did not form (as there were no exceptions to that report) matter of investiga *125 tion by the Court below, and consequently not for this J Court.
2d. Many of the exceptions of the plaintiffs were sustained, and still more of the exceptions and specifications of the defendants were overruled; and the defendants do not in this Court controvert those decisions.
3d. Many of the overruled exceptions of the plaintiffs are not insisted on, and many of the sustained exceptions of the defendants are not controverted by the plaintiffs in this Court.
[The Judge then noticed the exceptions which were the subject of controversy in this Court, and stated the opinion of the Court upon them; and proceeded:]
The transaction with the bank deserves a more special notice.
At the death of Kee, he owned stock in the Bank of the South Branch of Potomac, an unchartered institution, to the amount of 25,000 dollars, on which he had paid 10,000 dollars; and he was the ostensible debtor of that bank, by specialties given for loans from it to the amount of about 20,000 dollars. His executors, between his death and their qualification, made themselves responsible for this debt, or at least for 16,000 dollars, and afterwards proceeded to pay off the whole of the debt to the bank, appropriating to it the stock for the amount paid on it, to wit, 10,000 dollars, and the dividend of 300 dollars on it, accruing after the death of their testator, and the excess of the debt over these sums of 10,000 dollars and 300 dollars, they paid out of the assets of their testator, and claim credit therefor in the settlement of their executorial accounts. The Court below disallowed this credit, on the ground that the association with which the debt was contracted was illegal, and the consideration for which the specialties were given to it rendered them invalid; and the executors had improperly applied the assets of their testator to the payment of them.
*126 The objection thus founded on the legal invalidity of the specialties given for the loans, rests not on the ascription to the executors of actual knowledge that the law invalidated the specialties, but on the maxim that ignoranee of the law does not excuse; and the responsibilities of parties are governed by the legal intendment of knowledge of what the law is.
I think that it cannot be reasonably doubted, that in this case the executors paid these debts under the full conviction that they were valid: that they did not even conjecture that there was a colourable objection to their binding obligation on their testator and his estate; and the payment of them, so far as actual knowledge and intention can impress a character on the act was bona fide. Even the creditors who now insist on withholding this credit from the executors, and their able counsel, with their vigilance sharpened by the threatened loss of their debts, for more than 18 months after the death of the testator, were wholly unaware that these specialties were invalid. This is evinced by the fact that when the executors were about to confess judgments on them, such confession was resisted by the creditors, solely on the ground that the debt had been paid in whole or in part by the executors. If this stern maxim of law, which implies knowledge where it does not exist, and fixes responsibility as if it actually existed, shall subject the executors to the heavy loss of the payment in question, we may regret, but jhave no right to avert the consequence. We are not, however, forbidden from considering such a consequence as the infliction of a great hardship; and of requiring that before it is inflicted, the case for the application of the judgment producing it shall be made out on distinct allegation, and by clear proof of the facts which invalidate the specialties in question. It is not sufficient that the debt was contracted with an unchartered bank. Such a bank might legally exist under the act of 1805, as a bank of depo *127 sit, and even of discount, if it did not issue its bills or notes, or bills or notes of an unchartered banking company. This is conceded in the case of Spencer v. Wilson, 1 Rand. 76; and even a company formed with the intent to issue such bills or notes, would not be wholly outlawed. A valid obligation could be incurred by or to it, by a contract which had no connexion with the issue or circulation of such notes. The case of Spencer v. Wilson shews that the defence and the adjudication of its sufficiency, rested on the distinct averment, and the admission or proof that the consideration of the security sued on, was the notes of an unchartered banking company. In this case there is no distinct allegation that the consideration of the specialties was the notes or bills of the unchartered company. The proof, however, is, that such notes were received on the discount of the specialties for a large portion, if not the whole amount. But coupled with this proof, is the further proof, that in respect to a considerable amount, from 5000 dollars to 8000 dollars of the notes were returned, and notes of chartered banks received. Did my ultimate judgment on this question turn on the sufficiency of the allegation and proof that the consideration of the specialties was the notes of the unchartered company, I should, if I resolved that question in favour of the appellees, do so with spme hesitation; and to the extent of the substitution of the notes of the chartered banks, I should strongly incline to think, that to the extent thereof, that substitution gave validity to the specialties. This I should found on the analogous case, the law of which is well settled, of a security given on a usurious contract. In such a case, a subsequent rescission of the agreement to give and take usurious gain, and rejection thereof from the security, by the parties, free it from the usurious taint, and give it validity. But as my opinion on the matter in judgment does not require the resolution of either of these questions, I give no opinion on them, and dismiss them from further investigation.
*128 However strongly the conscience of Kee might have been invoked to return the value he had received, and which had availed him to its nominal amount, and to save his sureties from the harassment of suits, if not the opprobrium of the defence, which, if successful, coniiscated for his benefit the property of those who had confided in their engagement, his executors might not be justified by the stern principles of law, in listening to such invocation. If the law, in its rigour, absolved his testator from obligation, and the consequences to the estate of the testator of a successful appeal to the protection of its rigid rules, were limited to the exoneration of the estate from the claim, it may have been the duty of the executor to appeal to that protection, regardless of the inculcation of a morality that might reach and affect the conscience of his testator. The duties of the executor, though they may not be moulded by the finer moralities, which though sanctioned by conscience, cannot be enforced by law, are yet to be performed under the obligations of sound judgment, acting on those considerations of worldly prudence, which affect the safety of the pecuniary interests confided to his care. When such judgment, so governed, is fairly exercised, and (tested by the facts existing and known at the time it is exercised) is such as would probably be formed by a judicious man, managing his own affairs, with reference to considerations of mere worldly prudence, the executor is justified in acting on such judgment ; and so acting, is not responsible for alleged losses, resulting from his conduct.
Looking to the condition of things at the death of the testator, in respect to the state of his assets and responsibilities, the state of his business and property, and connections with others, the question is, were the exeecutors in the act of paying the debts due the Bank of the South Branch of Potomac governed by a judgment, having respect to the considerations of worldly prudence *129 alone, which a judicious man, under the influence of such considerations, would probably form and act on, in the arrangement of his own business. *
The only resistance that could be made to the claim for those debts, was the defect of legal obligation, arising from the nature of the association to which the debts were contracted, and the nature of the consideration received from that association. Kee had been one of the association, and owned 25,000 dollars of the stock, on which he had paid 10,000 dollars. Supposing this resistance made, it at once involved the loss of that stock; for the principle on which the resistance was founded, disavowed the right of the associators to all legal remedies to enforce their responsibilities, or claims inter se. If this was the only consequence, the resistance might be recommended by worldly prudence, for though its success involved the loss of the 10,000 dollars paid on the stock, it absolved the estate of upwards of 20,000 dollars of debt. But there were ulterior consequences which might follow, and which prudence required should be deliberately weighed. The responsibilities of the association were large and indefinite. The means to meet those responsibilities were the notes that had been discounted; and these were notes either of the stockholders or of others. The principle of law which would absolve the stockholders, would a fortiori absolve those not implicated in the legal delinquency of forming the association ; and the example of an associate claiming such absolution, would, in all human probability, be followed by the other debtors on discounted notes. The proximate and almost inevitable consequence of the example of claiming exoneration from the debts, on the ground of want of legal obligation on the contracts with the association, and that too in behalf of one of the associates, would have been an utter annihilation of all the means of the association to discharge its responsibilities; and those responsibilities *130 would remain a charge on the stockholders, binding them jointly and severally to the full amount of their large and indefinite extent, as far as the law might allow a remedy to enforce them. To what extent such remedy might exist, was and is problematical. Whether there would have been a legal remedy to recover the amount of the notes that might have been issued by the association, and in the hands of third persons not connected with it, was, and is undetermined. The decision of the Court of Appeals, which sustained the defence to a note discounted by such association, leaves undecided the question, whether the law will allow a remedy to the holder of the note against the association, with a strong intimation, however, that the policy of the law which forbade the remedy on the discounted note, did not oppose a barrier to the remedy on the note of the association. The able counsel, however, who maintained the nullity of the discounted note, conceded that the holders of the notes of the unchartered bank, could recover on them from the stockholders. When more stringent statutory inhibitions were provided against unchartered banks, it was the policy of the statute, to give it more certain effect, to provide that the notes issued by such bank, should bind each and every member of the association, and this statute had passed, and its provisions were known before the payment was made by the executors of Kee. But there were other responsibilities that would more certainly bind the association. Responsibilities on deposits, on advances to its use, on transfer notes or bills of others, acquired by the association, and passed off for value. Under the statutes in force at the time, private banking was, to a certain extent, lawful; and individuals, or many associated in partnership, might lawfully do all the business of banking, such as receiving deposits, discounting bills, contracting loans, or making loans, dealing in specie or the notes of chartered banks or individuals, in short all the *131 business of banking, except issuing bills or notes of an unchartered banking company. Such responsibilities diversified in form, and large in amount, in all probability, existed at the time of the death of the testator; and the destruction of the resources of the association by a successful resistance to its claims on the notes discounted by it, would leave the private estates of the associators exposed to the full amount of all such responsibilities. Would it have been prudent and judicious, having regard alone to the pecuniary interests of the estate, to have adopted a course which would have exposed it to the imminent risk of, if it did not certainly incur consequences that might probably prove ruinous to the estate ? Those consequences, by being averted, cannot now be accurately guaged. No one can, I think, safely affirm, even at this day, that the course adopted by the executors, in applying the stock their testator held in the bank, in part discharge of the debt, and paying the residue of that debt out of the assets, has not averted from the estate a loss more than equivalent to any gain that might have resulted from the denunciation of the association formed by their testator and others, as illegal; and the resistance on that ground of the claim resulting from his dealings with his associates. Still less can it be affirmed that a prudent and judicious man, managing his own affairs, having respect solely to the probabilities of profit and loss to result from his course, would not, under similar circumstances, have adopted that which was taken by the executors. I, therefore, am of opinion that the Court below erred in denying credit to the executors for the payments made to the Bank of the South Branch of Potomac, not including in such payments that claimed by the executors’ eighth exception. The decision of the Court below, on that exception, is correct, and ought to be affirmed.
The other Judges concurred in the opinion of Stanard, J.
*132 The decree of the Court was as follows:
The Court is of opinion, that the profits of the plantation and the saltpetre works, after the death of the testator, were equitable assets, and consequently that the accounts; embracing the charges for conducting them by the executors, after the testator’s death, and for supplies to the testator’s family, and the credits for the profits derived from them, should not have been involved in the account of the legal assets, and the administration thereof by the executors. But of the charges properly incurred by the executors in respect to the farm and saltpetre works, and the profits derived from them, a separate account should have been stated, the balance of which would be equitable assets, for which as such the executors would be chargeable. In stating such separate account, a reasonable credit in favour of the legal assets should be made against the profits, for the hire of the slaves and personalty of the testator employed on the farm and saltpetre works since the testator’s death, and for the amount of such credit for hire and personalty, the executors should be debited in the account of the legal assets.
The Court is further of opinion, that considering the principle on which the executors have been made accountable for the estate of their testator, (and justly so, having reference to the manner in which they have kept the accounts of their administration,) they have been charged in favour of those interested in the estate, probably, with as much, and perhaps more than they would have been, had the accounts been kept with the utmost exactness, it was not proper to inflict on them the further penalty of the loss of part of the customary commission of 5 per cent, on the personal estate for which they are held accountable; and the 10th exception of the executors to such reduction of commission ought to have been sustained, and they should be credited for the customary commission of 5 per cent.
*133 The Court is further of opinion, that the executors should have had credit for the excess of the payments made by them to the Bank of the South Branch of Potomac over the dividend received by the executors of that bank, and the amount allowed for the stock of their testator in that bank, excluding from such credit the payment claimed by the executors by their 8th exception, (the decision of the Court below on that exception being approved and affirmed,) and the costs incurred in the suits in behalf of the bank, and bringing the credit for the surplus of the debt paid the bank over the said dividend and allowance for stock into the account, so as to withhold from the executors any commission on the said dividend, or on the allowance for the stock so discounted, against the debt to the bank. The Court is further of opinion, that the exception of the defendants to the credit claimed by the executors for the payment made by them to Givens to get the cattle belonging to the estate out of his hands, ought to have been overruled, and that the Court below erred in sustaining it; and that the decree, so far as it conflicts with the foregoing opinion, is erroneous.
The Court doth therefore adjudge, order and decree, that so much of the said decree as is above declared to be erroneous, be reversed and annulled, and that the residue thereof be affirmed, and that the appellees pay to the appellant the costs by him expended in the prosecution of his appeal in this Court; and the case is remanded to the said Circuit Court for further proceedings, in conformity with the foregoing opinion and decree.